**This order is SIGNED.**





**Dated: March 31, 2016**

**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>Eugene V. McCauley, Jr.,<br><br>          Debtor. | Bankruptcy Number: 10-30907<br><br>Chapter 7<br><br>Judge R. Kimball Mosier |
| J. Kevin Bird, Trustee,<br><br>          Plaintiff,<br><br>v.<br><br>Michael McCauley, an individual; Susan Knorr, an individual; Nancy Gallegos, an individual; Elizabeth McCauley, an individual; and RE McCauley LLC, a dissolved Utah Limited Liability Company,<br><br>          Defendants. | Adversary Proceeding No. 12-2313 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON REMAND

This matter is before this Court on the United States District Court's order remanding the case for further proceedings (Remand Order) consistent with the District Court's memorandum decision and order of September 18, 2015.

## I. PROCEDURAL BACKGROUND

The Trustee's complaint asserted claims based on alter ego, resulting trust, and

constructive trust and sought damages and turnover for violation of the automatic stay and

avoidance and recovery of the unauthorized post-petition transfer of certain real property referred

to as the "Ballard Property."[1]  On September 30, 2014, after trial, this Court entered its written

Findings of Fact and Conclusions of Law determining that J. Kevin Bird (Trustee) had failed to

carry his burden of proof on his claims for resulting trust, constructive trust, and alter ego and

entered judgment against the Trustee on those claims.  Because the Trustee's claims for violation

of the automatic stay and unauthorized post-petition transfer were dependent on the Court finding

that the Ballard Property was property of the bankruptcy estate, this Court dismissed those

claims.

The Trustee appealed this Court's judgment to the United States District Court for the

District of Utah.  The District Court disagreed with this Court's conclusion that the Trustee had

failed to prove the requisite elements for imposition of a constructive trust and ruled that "a

constructive trust should be imposed to reflect Eugene McCauley's interest in REM and REM's

assets, including the Ballard Property and the REM bank account."  After making that

determination, the District Court ordered that "the September 30, 2014 decision of the United

States Bankruptcy Court for the District of Utah in Adversary Proceeding No. 12-2313,

Bankruptcy Case No. 10-30907, is REVERSED and REMANDED for a determination of

whether the post-petition transfer of the Ballard property was an avoidable transfer."  On remand,

the parties were given an opportunity to submit additional briefing and present oral argument.

---

[1] The Ballard Property consists of a 60-acre tract of ranch land with a residence, a 120-acre tract
of ranch land, and Dry Gulch Irrigation water shares.

It is clear from the District Court's Remand Order that this Court's decision on the

Trustee's constructive trust claim was reversed.  It does not appear that the District Court

intended to reverse this Court's decision with respect to the Trustee's resulting trust and alter ego

claims.[2]  But because the District Court's Remand Order reversed "the September 30, 2014

decision of the United States Bankruptcy Court for the District of Utah," there is potential for

confusion with respect to the status of the Trustee's resulting trust and alter ego claims.  In order

to ensure a complete and final adjudication of all claims consistent with the District Court's

Remand Order, this decision will address all of the Trustee's claims.


## II.  JURISDICTION

The Trustee commenced this adversary proceeding seeking a judicial determination under

theories of constructive trust, resulting trust, and alter ego that RE McCauley, LLC (REM) and

its remaining assets, including real property in Uinta County, Utah (Ballard Property), belonged

to Eugene V. McCauley, Jr. (Debtor) on the date that the Debtor filed his bankruptcy petition.

To the extent that the Trustee seeks a determination that REM and its remaining assets are

property of the Debtor's bankruptcy estate, the Trustee's complaint is a "core" proceeding, and

this Court has jurisdiction under 28 U.S.C. § 157(b)(2)(A), (E) & (O) and 28 U.S.C. § 1334. The

Trustee's claim under 11 U.S.C. § 549 is a "core" proceeding, and this Court has jurisdiction

under 28 U.S.C. § 157(b)(2)(A) & (O) and 28 U.S.C. § 1334.

Federal courts have long recognized a "probate exception" to otherwise proper federal

jurisdiction. "[T]he probate exception reserves to state probate courts the probate or annulment of

---

[2] The District Court noted that the Trustee did not reiterate his resulting trust or alter ego
arguments and the District Court limited its analysis to the Trustee's constructive trust claim.

3

a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court."[3] The "probate exception" does not bar federal courts, however, "from adjudicating matters outside those confines and otherwise within federal jurisdiction."[4] Accordingly, this Court is not deciding, and will not decide, whether Susan Knorr properly performed her duties as the trustee of the Ruth E. McCauley Revocable Trust (Trust) or executor of Ruth E. McCauley's probate estate. This Court is not deciding what assets poured into or should have poured into the Trust. This Court is not deciding what assets or distributions the Debtor was entitled to receive as a beneficiary of the Ruth E. McCauley estate, nor is this Court attempting to equally re-distribute assets of the Ruth E. McCauley estate. Even if Eugene "should" have received more from Ruth's estate, and the Trustee had proved the amount Eugene should have received, this Court cannot order a re-distribution of assets.[5] These determinations fall within the "probate exception" and should be determined by a state court.

The decision of this Court is limited to the narrow issue of whether the Debtor had a legal or equitable interest in REM and its remaining assets, including the Ballard Property, under one of three doctrines: (a) constructive trust, (b) resulting trust, or (c) alter ego, and whether there was an avoidable post-petition transfer of property of the estate.

---

[3] *Marshall v. Marshall*, 547 U.S. 293, 311–12 (2006).

[4] *Id*. at 312.

[5] It should be clear that the Court is not suggesting that the Trustee would have no claims or remedies to seek an equal distribution of Trust assets to Eugene or damages resulting from the failure to distribute Eugene's equal share to him. The Court is simply reemphasizing that it does not have jurisdiction to address those claims.

### III.  FINDINGS OF FACT

There is no inconsistency between this Court's factual findings and the District Court's factual findings.  This Court's prior factual findings are restated here and are augmented by the District Court's additional express factual findings, which are italicized.

The Court did not find any of the Defendants' testimony particularly credible.  They all failed to remember facts and events of significance, except in those instances where their testimony supported facts or events that may be helpful to their case.  Notwithstanding the lack of witness credibility, the following facts are clearly established by the record.

Ruth E. McCauley had four children: Eugene V. McCauley, Jr., Michael G. McCauley, Susan K. Knorr, and Nancy L. Gallegos.  On June 1, 2000, the Debtor was incarcerated.  At the time of his incarceration, the Debtor was married to Elizabeth McCauley.

Four days after Eugene was incarcerated, Ruth created the Trust.  Ruth was the sole beneficiary under the Trust and she appointed herself and Susan as co-trustees.  The Trust directed that upon Ruth's death, after paying certain Trust obligations, the "Trust Estate shall then be distributed . . . with the children of Ruth E. McCauley, to wit, Eugene V. McCauley, Jr., Michael G. McCauley, Susan K. Knorr and Nancy L. Gallegos, each receiving equal shares."[6] On the same day Ruth created the Trust she also executed a separate will bequeathing all of her property to the Trust.  Sometime after the formation of the Trust, Ruth quitclaimed property she owned in Lehi, Utah to the Trust.

In December 2003, the Trust sold its interest in the Lehi property to Wentworth Development LLC.  As part of the transaction, Ruth received a quitclaim deed to some of the real

---

[6] Article XVI, paragraph C.

property the Trust had sold to Wentworth.  The quitclaim deed conveyed proposed lots 1 and 2 of the Bull River Ridge subdivision to Ruth.  In connection with the sale of the Lehi property, the Trust also entered into a 1031 tax exchange with Everet and Janet West whereby the Trust was to receive the Ballard Property.

On January 23, 2004, Ruth formed REM with herself as the sole member and manager. The Trust's 1031 exchange for the Ballard Property was completed in March 2004.  In June 2004 the Trust conveyed the Ballard Property to REM.  Susan testified that Ruth transferred the Ballard Property to REM to avoid liability for any potential personal injury claims.  REM never engaged in any business activities, maintained any business records, or filed any tax returns. REM did maintain a bank account at Mountain America Credit Union (REM Account.)[7]  In May 2005, Ruth updated REM's records filed with the Division of Corporations and Commercial Code of the Utah Department of Commerce (Utah Department of Commerce) to add Susan as a member.  Susan held her REM membership interest in her capacity as Ruth's personal representative and trustee of the Trust.[8]

In February 2004 Susan formed EMSN, LLC.  Susan was EMSN's only member and manager but Susan testified that EMSN was formed at Ruth's request.  In April of that same year, Ruth conveyed lots 1 and 2 of the Bull River Ridge subdivision to EMSN.  There was a home on lot 2, but lot 1 was raw land.  Susan testified that lot 2 was transferred to EMSN to hold

---

[7] Although REM maintained several accounts at Mountain America Credit Union, the REM Account refers to the primary account that the parties used to conduct the transactions relevant to this case.

[8] Trustee's counsel successfully impeached Susan's testimony at the time of trial, and I found Susan's prior testimony that she held her REM membership interest in her capacity as Ruth's personal representative and trustee of the Trust to be more credible.

for Nancy but she didn't know what was going to happen to lot 1.  There were also water shares associated with the Lehi property that were transferred to EMSN.

Ruth died on July 22, 2006, and Susan became the sole trustee of the Trust.  *In addition, the Trust became irrevocable.* Under the terms of the separate will, all of Ruth's non-Trust assets were to "pour over" and become assets of the Trust upon her death. *So when Ruth McCauley died, the Trust became the owner of Ruth McCauley's membership interest in REM.* Susan also served as executor of Ruth's will.  Susan failed to maintain any accounting, informal or otherwise, with respect to Ruth's assets or the Trust assets.  The evidence before the Court is, at the time of Ruth's death, the Trust had bank accounts at Mountain America Credit Union, a home in Roosevelt, Utah, and a membership interest in REM, but there is no evidence as to the value of the assets.  The Court was not provided with a comprehensive list of the assets or an accounting of the assets that were to be distributed pursuant to the terms of the Trust or the will.

The Defendants offered no accounting of the Trust assets.  The Trustee did introduce into evidence selected statements and checks for one of the Trust's bank accounts.  The statements and checks are clearly only a small portion of the total statements and checks, and the Trustee did not attempt to create a complete picture with respect to the disposition of Trust assets.  The statements show that the Trust's combined accounts totaled over $225,000 in July and August 2005.  By February and March 2007 the Trust's accounts totaled just under $60,000.  At the beginning of November 2007 the accounts totaled just over $90,000.  By the end of November, Susan had transferred approximately $40,000 to herself and $50,000 to the REM Account.  The funds transferred to the REM Account can be traced to a savings account designated "EVM," originally opened while Ruth was alive.  All of the Trust's accounts were apparently closed near

7

the end of November 2007.  The selected checks drawn on the Trust's accounts establish that

Michael received just over $58,000 from the Trust in 2006.  There were also some selected

statements and checks from the REM Account introduced into evidence.  Again, these records

are incomplete, but the checks show that Nancy or her designees received over $18,000 from

REM in 2006.

In January 2007 Nancy was added as a member of EMSN.  In September 2007 Susan sold

the water shares owned by EMSN for $90,000.  The sale proceeds were distributed to Susan and

Nancy.  In December of that year, Susan, as the managing member of EMSN, conveyed lot 1 in

the Bull River Ridge subdivision to Michael.

By May 2008 Susan had distributed substantially all of the cash assets of the Trust.  The

evidence shows that Michael received over $58,000 from the Trust's accounts, Susan received

approximately $40,000, and approximately $50,000 was transferred to REM. The balance of the

Trust's cash assets in excess of $125,000 are unaccounted for.  In May 2008 the home that was

Trust property and the Trust's interest in REM, including the REM Account, remained in the

Trust.

Eugene was released from prison on May 20, 2008, and about that time Susan arranged

for Eugene and Elizabeth to move into and live at the Ballard Property, which was still held by

REM.  Within three weeks of Eugene's release, Susan also arranged to make him a signatory on

the REM Account.  On the signatory application prepared under Susan's direction, the Debtor

was identified as an "authorized signer/manager" for REM, his address was listed as REM's

address, his phone number was listed as REM's phone number, and his e-mail address was listed

as REM's e-mail address. When Susan made Eugene a signatory, there was $49,303.20 in the

8

REM Account.  After becoming a signatory on the REM Account, the Debtor was the only party who wrote checks against the account.

After moving into the Ballard Property, the Debtor paid no rent; was responsible for all maintenance and repairs; paid for utilities, water, and taxes; identified himself as the owner and loss payee in an application for homeowner's insurance; and signed *and* recorded an easement in favor of Moon Lake Electric *that burdened the Ballard Property*.  Susan disputes that the Debtor had authority to execute the easement.

*On May 25, 2008, Susan signed a document that stated, "The Ruth E. McCauley Revocable Trust has been revoked as of the 25th day of May 2008 and any and all assets have been distributed as I Susan K. Knorr the Trustee have seen fit." Eugene, Michael, Susan, and Nancy signed the document as beneficiaries of the Trust.*

On March 5, 2009, Susan updated REM's filings with the Utah Department of Commerce to reflect that Elizabeth had become a member and that Susan's status had changed from member to manager.  *When asked about the March 5, 2009 change in membership that named Elizabeth as the sole member of REM, Susan testified that she did not remember making the change or the reason for doing so.*  In April 2009, Susan, as the managing member of EMSN, conveyed lot 2 of the Bull River Ridge subdivision to Nancy.

While Eugene had been incarcerated, Yukon Excavation, LLC obtained a judgment against him in the principal amount of $92,754.03.  On July 22, 2010, just before its 2002 judgment was to expire, Yukon obtained a writ of garnishment directed to Susan as trustee for the Trust.  On August 2, 2010 the writ of garnishment was personally served on Susan.  On August 4, 2010 Susan conveyed the home in Roosevelt, owned by the Trust, to herself and her

daughters, Sonja Gregersen and Chandra Tucker.  On August 11, 2010 the Debtor paid a $200

overdraft charge and closed the REM Account.  The following day, on August 12, 2010, the

Debtor filed a petition commencing his chapter 7 bankruptcy.  In his schedules filed on August

26, 2010, the Debtor identified Yukon as the only creditor having a significant claim against him.

On August 30, 2010 Susan (signing as manager of REM) conveyed the Ballard Property

to Michael, Nancy, and herself.  Notwithstanding this transfer of the Ballard Property, the Debtor

continues to reside there rent-free.  On September 9, 2010 Susan filed articles of dissolution for

REM stating that the reason for the dissolution was to "PUT THE PROPERTY IN OUR

INDIVIDUAL NAMES [and] DISSOLVE[ ] THE LLC."  In the articles of dissolution Susan

stated that the effective date of REM's dissolution was May 20, 2009. *On September 9, 2010,*

*and May 20, 2009, Elizabeth was the only member of REM listed on the records filed with the*

*Utah Department of Commerce. In March 2014, at the time of trial, Eugene and Elizabeth*

*continued to reside at the Ballard Property. Elizabeth testified that, until she learned of the*

*adversary proceeding, she had never heard of REM and was not aware that she was a member.*

*Michael testified that he had no interest or involvement in REM. Nancy testified that she knew*

*nothing about REM until the adversary proceeding.*

No information was provided at trial with respect to the value of any of the above-

described real property distributed to Michael, Susan, and Nancy.  Susan testified that she kept

no summary or accounting of assets owned by the Trust, no record of the value of those assets,

and no record of the distribution of such assets that she made to herself and her siblings.  No

information was provided at trial with respect to the amount of equity in the real property when it

was distributed.  No evidence was introduced at trial showing the value of REM.  No information

was provided at trial with respect to the value of the Ballard Property, the encumbrances, if any,

on the Ballard Property, or the amount of equity in the Ballard Property.


## IV.  CONCLUSIONS OF LAW

The Trustee's theory of his case is fairly straightforward.  At the time of Ruth's death

there were substantial assets that could be traced to the sale of real property that Ruth once

owned.  Even though Ruth had transferred some of these assets to EMSN, REM, and her Trust,

the Trustee asserts that all of these assets should have been distributed equally to Eugene,

Michael, Susan, and Nancy as provided by Ruth's Trust.  Because Michael, Susan, and Nancy

each received substantial cash in an unknown amount, and a parcel of real property of unknown

value, the remaining parcel of real property, the Ballard Property, is in fact Eugene's and the

Court should so find.

Although the Court is not deciding what Eugene should have received from the Trust, the

Court can clearly consider evidence of what Eugene should have received as evidence that

supports the Trustee's claims.  For example, intent is an important or essential element of the

Trustee's claims.  Evidence that the value of the assets the Trustee seeks to recover is equal to the

value of the assets Eugene should have received would support an intent to convey the beneficial

interest in those assets to Eugene. The Trustee did not offer any evidence that REM and its assets

equaled or approximated Eugene's equal share of assets to be distributed to him under the Trust.

The Trustee asserts that "each of the siblings (except the debtor) received at least one

parcel of real property and cash of substantial value."  The evidence does not support the

Trustee's suggestion that all of the real property and cash the Debtor's siblings received was from

11

the Trust.  It is very plausible that Ruth intentionally put assets in EMSN to exclude them from

her Trust and the claims of Eugene's creditors.  The real property Michael and Nancy received

was owned by EMSN.  Nancy and Susan also received a significant amount of cash from the sale

of the water shares owned by EMSN.  Even though Susan's testimony with respect to EMSN was

vague and evasive, there is no evidence that Ruth, or anyone else, intended that EMSN assets be

included in the Trust.  The Court cannot simply ignore EMSN as a separate entity at the Trustee's

suggestion.  Even though Susan failed to keep an accounting of Trust assets, the evidence that

was offered and received by the Court clearly establishes that the Trust assets were not divided

equally among the siblings and that Nancy may have received little or nothing from the Trust,

other than distributions of REM's assets.[9]


## A.  A Member of an LLC Has No Interest in Specific Property of the LLC.

The Trustee seeks a judicial determination "that REM and its assets (including the

Ballard Property) were property of the Debtor and became property of the estate upon filing of

his bankruptcy."  In seeking this determination, the Trustee glosses over any distinction between

membership interests in REM, which are personalty, and the Ballard Property, which is real

property.  He simply equates the two.  The Court cannot simply equate Ruth's, Susan's, or

Elizabeth's REM membership interest with an interest in the Ballard Property.  Under Utah law,

a member of an LLC has no interest in specific property of the company.[10]  The fact that

---

[9] The Court recognizes that the Trustee introduced evidence that Nancy received $15,000 from
REM and a one-third interest in the Ballard Property.

[10] Utah Code Ann. § 48-2c-701(2).

12

Elizabeth may have had a membership interest in REM may be considered for evidentiary purposes, but even if the Court were to find that Elizabeth was holding the membership interest for Eugene's benefit, neither Elizabeth nor Eugene have an interest in the Ballard Property simply because of that membership interest.

## B.  Elizabeth's Membership Interest in REM.

One of the differences between this Court's conclusions of law and the District Court's conclusions relates to the membership interest in REM. This Court concluded that Ruth's membership interest was not extinguished when she died and remained an asset of the Trust that was not accounted for.

The District Court agreed that Ruth's interest in REM poured over into the Trust but concluded that "after [Ruth's] death [Susan] held or controlled 100% of the REM membership interest *and did so as trustee and personal representative of Ruth McCauley's estate.*" (emphasis added).  The District Court concluded that "[i]t is not clear when Ruth McCauley's interest in REM was transferred from the Trust or to whom it was transferred. But, as of May 25, 2008, the Trust no longer held any interest in REM. And nearly a year later, [Susan] updated REM's public records to list Elizabeth as REM's sole member. This filing, combined with the fact that the Trust no longer held an interest, confirms that Elizabeth held a 100% membership interest in REM." Based on its analysis, the District Court reversed this Court's ruling that the Trustee had failed to establish that Elizabeth held a 100% membership interest in REM.

Although the District Court came to a different conclusion than this Court, it would appear that this is not the principal basis for remand. Even though Elizabeth held a 100% interest in REM, it does not necessarily follow that she held this interest in constructive trust for Eugene.

## C. The Elements of Resulting Trust and Constructive Trust Are Different.

The Trustee fails to specifically address the elements necessary to establish his claims for constructive or resulting trust, but consistently refers to them jointly as if they were equivalent remedies simply because the end result the Trustee seeks is the same. Resulting trusts and constructive trusts are both equitable remedies that arise by operation of law and may be proved by use of parol evidence,[11] but the two remedies are not equivalent.

The Utah Supreme Court has observed that "the most notable distinction between constructive trusts and other types of trusts, such as express and resulting trusts, is generally the 'intention' element."[12] There must be a "manifestation of intent" that the transferee should not have the beneficial interest in the property before the court may impose a resulting trust.[13] Aside from the exception described below, "constructive trusts generally are not based upon the 'intention' of the parties."[14] "A constructive trust is an equitable remedy to prevent unjust enrichment, and a purchase money resulting trust is an equitable remedy designed to implement

---

[11] *Zion's First Nat'l Bank v. Fennemore (In re Estate of Hock)*, 655 P.2d 1111, 1114 (Utah 1982).

[12] *Parks v. Zions First Nat'l Bank,* 673 P.2d 590, 598 (Utah 1983).

[13] *Id.*

[14] *Id.*

what the law assumes to be the intentions of the putative trustor."[15]  As the Utah Supreme Court

has explained,

> The constructive trust * * * is to be distinguished from a resulting trust. Where A's money is used by B with A's consent in purchasing property in the name of B, a resulting trust arises in favor of A. Where A's money is used by B without A's consent in purchasing property in B's name, B holds the property upon a constructive trust for A. In the former case, the resulting trust arises because of the presumed intention of the parties. In the latter case, the constructive trust is imposed upon B to prevent his unjust enrichment.[16]

One exception to the general rule that constructive trusts are not based on the intention of

the parties is where a constructive trust is imposed to give effect to an oral express trust. Oral

express trusts, like traditional trusts, are the manifestation of a settlor's intent to impose

obligations on a trustee to act for the benefit of others.[17]  It should be noted that there is a

difference between the intent required to establish a resulting trust and the intent required to

establish an oral express trust. As one court explained:

> The difference appears to be that in the case of an express trust the circumstances give rise to an inference that the grantor had an affirmative intention to create a trust, whereas in the case of a resulting trust the circumstances give rise to an inference that [the] grantor had no intention to give the beneficial interest to the transferee.[18]

In other words, the difference between an intent to convey the beneficial interest as opposed to an

intent to retain the beneficial interest.

In summary, a court may impose a resulting trust if it finds that the circumstances give

rise to an inference that the transferor had no intention to convey the beneficial interest to the

---

[15] *In re Estate of Hock*, 655 P.2d at 1114.

[16] *Hawkins v. Perry*, 253 P.2d 372, 375 (Utah 1953) (citation omitted).

[17] *Rawlings v. Rawlings*, 240 P.3d 754, 762 (Utah 2010).

[18] *Belton v. Buesing (In re Estate of Buesing)*, 402 P.2d 98, 101 (Or. 1965).

15

transferee.  A court may impose a constructive trust to give effect to an oral express trust when

the circumstances give rise to an inference that the transferor intended to create a trust or where a

party has been unjustly enriched.

### D.  The Trustee Has Failed to Establish His Claim For a Resulting Trust.

"[T]he proof required to impose a resulting trust 'must be strong, clear, and convincing,

such as to leave no doubt of the existence of the trust,' and that it is the intention 'at the time of

the transfer and not at some subsequent time which determines whether a resulting trust

arises.'"[19]  The party claiming a resulting trust cannot satisfy its burden of proof merely by

presenting some evidence in support of its claim.[20]  The party asserting a resulting trust bears the

burden of proving the existence of the resulting trust by the clear and convincing standard, which

requires "evidence demonstrating 'that there is no serious or substantial doubt as to the

correctness of the conclusion.'"[21]

A resulting trust arises in favor of the person who transfers the property, or in the case of

a purchase money resulting trust, the person who pays for the property transferred.  For the

Trustee to prevail on his resulting trust claim, he must establish that Eugene transferred

Elizabeth's membership interest in REM (or was the successor to the transferor), or that Eugene

---

[19] *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1341 (10th Cir. 1998) (quoting *Chambers v. Emery*, 45 P. 192, 195 (Utah 1896) and Restatement (Second) of Trusts § 443 cmt. a).

[20] *See Baker v. Pattee*, 684 P.2d 632, 638 (Utah 1984) ("No resulting trust could come into being, as the plaintiff did not prove that [the deceased] intended anything but an unconditional conveyance of her property.").

[21] *Nikols v. Goodman & Chesnoff*, 206 P.3d 295, 298 (Utah Ct. App. 2009) (quoting *Northcrest, Inc. v. Walker Bank & Trust Co.*, 248 P.2d 692, 698 (Utah 1952)).

16

paid for that membership interest. The Trustee has failed to present any evidence to meet this element of his claim, but simply asserts that the beneficial interest is held for Eugene. There is no evidence that Eugene ever acquired a membership interest or transferred a membership interest to Elizabeth.

Prior to REM's formation, the Ballard Property was an asset of the Trust and under Ruth's control. Ruth acquired her membership interest when she formed REM. Although Susan was subsequently listed as a member, the evidence, including Susan's own testimony, is that Ruth intended to retain the beneficial interest in REM. Ruth was the manger of REM and retained control of REM's assets, including the Ballard Property. The evidence is that all the beneficial interest in REM was still retained by Ruth when she listed Susan as a member of REM and that Susan held the membership interest in her capacity as trustee of Ruth's Trust. There was no evidence that Ruth intended to convey the beneficial interest in REM or the Ballard Property to Eugene.

**E.  The Trustee's Constructive Trust Claim**.

The Court must look to state law "to determine when the constructive trust doctrine applies,"[22] and "[t]he party seeking imposition of a constructive trust bears the burden of establishing the trust requirements."[23]  Under Utah law, the proponent must demonstrate by clear and convincing evidence that a constructive trust should be imposed.[24]  In its most recent

---

[22] *Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1452 (10th Cir. 1996).

[23] *Hill v. Kinzler (In re Foster)*, 275 F.3d 924, 926 (10th Cir. 2001).

[24] *Hiltsley v. Ryder*, 738 P.2d 1024, 1026–27 (Utah 1987) (citations omitted).

decision addressing constructive trusts, the Utah Supreme Court explained that constructive

trusts are a remedy that may be imposed where necessary to give effect to an oral express trust or

where a party has been unjustly enriched.[25]  The Trustee asserts that Elizabeth and Susan were

the Debtor's nominees under a constructive trust,[26] but it is not at all clear whether the Trustee is

alleging a constructive trust should be imposed to give effect to an oral express trust or as a

matter of equity because a party has been unjustly enriched.


### 1.  The Trustee Has Failed to Establish a Constructive Trust Based on an Oral Express Trust.

In the *Rawlings* case, the Utah Supreme Court explained the elements of an oral express

trust as follows:

> Oral express trusts have "certain fundamental characteristics" in common with
> traditional trusts because, like traditional trusts, they are the manifestation of a
> settlor's intent with regard to property.  The main such characteristic is the
> imposition of obligations on a trustee "to act for the benefit of [beneficiaries] as to
> matters within the scope of the [trust]."  Like trusts created by a valid writing,
> constructive trusts imposed to give effect to oral express trusts are adequately
> characterized as "'a fiduciary relationship with respect to property, arising as a result
> of a *manifestation of an intention to create it* and subjecting the person in whom the
> title is vested to equitable duties to deal with it for the benefit of others.'"[27]

Oral express trusts will be given effect and "constructive trusts may be imposed in the

circumstances set forth in section 45 of the Restatement (Second) of Trusts . . . .  This section

---

[25] *Rawlings*, 240 P.3d at 761–62.

[26] Trustee's Complaint, Second Claim for Relief, at 6–7.

[27] *Rawlings*, 240 P.3d at 762 (citations omitted).

18

applies when the transferor of land intends for the transfer to benefit someone other than the transferor or the transferee."[28]   Section 45 of the Restatement of Trusts provides:

> (1) Where the owner of an interest in land transfers it inter vivos to another in trust for a third person, but no memorandum properly evidencing the intention to create a trust is signed, as required by the Statute of Frauds, and the transferee refuses to perform the trust, the transferee holds the interest upon a constructive trust for the third person, if, but only if, (a) the transferee by fraud, duress or undue influence prevented the transferor from creating an enforceable interest in the third person, or (b) the transferee at the time of the transfer was in a confidential relation to the transferor, or (c) the transfer was made by the transferor in anticipation of death.[29]

"In short, the imposition of a constructive trust under this section of the Restatement of Trusts requires proof that the transferor of land intended to create a trust and that one of the three identified circumstances existed at the time of the transfer."[30]

The Trustee argues that "[t]he Debtor's legal interest is proved by the fact that Elizabeth held her membership interest as trustee under an express trust (which can be implied under the circumstances)."[31]   It appears the Trustee is asserting that Elizabeth was the "transferee" or "the person in whom the title is vested" pursuant to an oral express trust, but he has not attempted, and has therefore failed, to identify the settlor of the express trust, any manifestation of an intent to create an express trust, or a transfer pursuant to an oral express trust.   REM was created by Ruth, and there is evidence that Susan held her membership interest in REM pursuant to Ruth's

---

[28] *Id.* at 762.

[29] Restatement (Second) of Trusts § 45 (1959).

[30] *Rawlings*, 240 P.3d at 762.

[31] Trustee's Trial Brief, at 16.  The Trustee cites no legal basis for his proposition that an express trust can be implied.  By definition, implied is not express.  The Court will assume the Trustee is arguing that the Court may infer that Elizabeth was holding the REM membership interest pursuant to an oral express trust based on the evidence he has presented.

19

oral express trust for the benefit of her siblings.  While Susan's and Elizabeth's testimony

regarding Elizabeth's membership interest was vague and evasive, it certainly was not helpful in

establishing an intent to create an oral express trust.

More problematic for the Trustee is that there is no evidence that "one of the three

identified circumstances existed at the time of the transfer."  There is no suggestion that

Elizabeth by fraud, duress or undue influence prevented Susan or REM from creating an

enforceable interest in Eugene, or that any transfer to Elizabeth was made in anticipation of

death.  As to the circumstance of a confidential relationship: "A confidential relationship arises

when one party, after having gained the trust and confidence of another, exercises extraordinary

influence over the other party.  If a confidential relationship exists between two parties to a

transaction, and if the superior party (in whom trust has been reposed) benefits from the

transaction, a presumption of undue influence is raised."[32]  There is no evidence that there was a

confidential relationship between Elizabeth and Susan.


## 2.  The Trustee's Constructive Trust Claim Based on Unjust Enrichment.

Under Utah law, "[c]ourts recognize a constructive trust as a matter of equity where there

has been (1) a wrongful act, (2) unjust enrichment, and (3) specific property that can be traced to

the wrongful behavior."[33]  "A claim for unjust enrichment in Utah requires proof of three

elements: '(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by

the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit

---

[32] *In re Estate of Jones v. Jones*, 759 P.2d 345, 347 (Utah Ct. App. 1988) (citations omitted).

[33] *Wilcox v. Anchor Wate Co.*, 164 P.3d 353, 362 (Utah 2007) (citation omitted).

under such circumstances as to make it inequitable for the conferee to retain the benefit without

payment of its value.'"[34]  This Court concluded that the Trustee had failed to address the specific

elements of his constructive trust claim and only generally argued that Elizabeth "would be

unjustly enriched if she were permitted to retain [her membership interest] in derogation of the

Debtor's equitable interest."[35]  In this Court's opinion, the Trustee's overall tenor in this case was

that the alleged transfer of the REM membership to Elizabeth was wrongful to Eugene's

creditors.  As the Tenth Circuit has noted, the court must view the situation from the position of

the party claiming ownership of the equitable interest—not that party's creditors—to determine

whether it would be wrong to let the conferee keep the property.[36]  Even if the Defendants and

Eugene acted with the intent to shield REM's assets from Eugene's creditors, the Trustee did not

articulate, and this Court failed to see, how it could be wrongful to Eugene, and how Elizabeth

would be unjustly enriched, if Elizabeth kept her membership interest in REM.  In May 2008,

Eugene acknowledged that the "Ruth E. McCauley Revocable Trust has been revoked as of the

25th of May 2008 and any and all assets have been distributed" as Susan had seen fit.  Eugene

signed this acknowledgment knowing that, other than the REM Account, he had not received any

additional interest in REM or its assets, including the Ballard Property.  Eugene either knowingly

waived any claim to REM and its assets or conspired with other Defendants to hinder, delay or

defraud Eugene's creditors.  If Eugene and the other Defendants conspired to hinder, delay or

defraud Eugene's creditors by placing REM and its assets in Elizabeth's name, creditors may

---

[34] *Rawlings*, 240 P.3d at 763 (citation omitted).

[35] Trustee's Trial Brief, at 16.

[36] *In re Taylor*, 133 F.3d at 1342.

have a claim against the Defendants, but this Court failed to see how Eugene, if he perpetrated a

wrong, can seek an equitable remedy when he has unclean hands.  Because the Trustee must

stand in Eugene's shoes to assert Eugene's equitable interest, this Court failed to see how the

Trustee could prevail on his constructive trust claim.

The District Court disagreed and reversed this Court's decision.  The District Court

concluded that "[i]n Utah, there are multiple legal standards that courts apply to determine

whether a constructive trust should be imposed. Section 160 of the Restatement (Second) of

Trusts [sic][37] provides one such standard. Because the bankruptcy court failed to acknowledge

and apply § 160,[38] the Trustee argues its decision should be reversed." As the District Court

noted, in *Parks v. Zions First National Bank* the Utah Supreme Court adopted § 160 and

explained that this section "presents the broadest possible application of a constructive trust.  It

provides that a constructive trust may arise where a person holding title to property is subject to

an equitable duty to convey it to another on the ground that he would be unjustly enriched if he

were permitted to retain it."[39]

---

[37] Although the District Court referred to the Restatement (Second) of Trusts, it would appear that the intended reference is to the Restatement (First) of Restitution § 160 (1937).

[38] Although I did not specifically address § 160 of the Restatement of Restitution, I clearly addressed the three requisite elements of constructive trust as set forth by the Utah Supreme Court in *Parks v. Zions First National Bank* and argued by the Trustee's counsel.  To wit: (1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.  *See Bird v. McCauley (In re McCauley)*, 520 B.R. 874, 887–88 (Bankr. D. Utah 2014).

[39] *Parks*, 673 P.2d at 599 (citation and internal quotation marks omitted).

22

The District Court concluded that the Trustee met his burden to provide clear and convincing evidence to support his claim for constructive trust. The following portion of the District Court's Remand Order is specifically incorporated herein:

> When Ruth McCauley died in July 2006, the terms of the Trust required that the Trust property be distributed equally among her four children. Under this provision, all four siblings, including Eugene McCauley, had an equitable interest in the Trust's property. The bankruptcy court found that Ruth McCauley's estate was not distributed equally as required by the Trust. The court does not disagree with this finding. But even accepting an unequal distribution of Ruth McCauley's estate, the bankruptcy court found evidence that Eugene McCauley's siblings received substantial distributions from the Trust while he was incarcerated. Ms. Gallegos or her designees received over $18,000 from REM in 2006. Ms. Knorr received approximately $40,000 from the Trust. And Michael McCauley received over $58,000 from the Trust's accounts. Each of the siblings, except Eugene McCauley, had received substantial proceeds from the Trust before Eugene McCauley was released from prison. The parties also stipulated that "[e]xcept for the Trust's ownership interest in REM . . . [Ms. Knorr] had distributed substantially all of the property of the Trust to Michael McCauley, herself, and [Ms. Gallegos] by May 2008." In sum, when Eugene McCauley was released from prison on May 20, 2008, he had not received any distribution from the Trust and the only remaining Trust property was the Trust's ownership interest in REM.

> On May 25, 2008, the Trust was revoked, with the representation from the four siblings that all Trust assets had been distributed. At trial, Michael McCauley and Ms. Gallegos confirmed that they claimed no interest in REM. If the REM interest was not distributed to Eugene McCauley, it remained with Ms. Knorr. But on March 5, 2009, Ms. Knorr disclaimed any interest she may have had in REM and identified Elizabeth as REM's only member. The bankruptcy court relied on the Utah Revised LLC Act for the conclusion that, even if Elizabeth was the only member of REM, she did not own REM's assets. Although the statute does state that a member of an LLC has no interest in specific property of the company, Utah Code Ann. § 48-2c-701(2), it also defines a "member" of an LLC as a person with "an ownership interest in a company." *Id.* 48-2c-102(14)(a). As of March 2009, Elizabeth was the only member of REM and therefore the only person with an ownership interest in the company.

> Although Elizabeth was the sole member of REM, there is no evidence that she held her membership interest for herself. Elizabeth was not a beneficiary of the Trust. And she had no knowledge of REM or the fact that she was the LLC's only member. Eugene McCauley, however, did have an equitable interest in REM as one of Ruth McCauley's heirs and as a beneficiary of the Trust.

Moreover, Eugene McCauley had plenary control over REM's assets. As the parties stipulated before trial, when Eugene McCauley was released from prison on May 20, 2008, Ms. Knorr arranged for him and Elizabeth to move onto and live at the Ballard Property. Eugene McCauley paid no rent but was responsible for all maintenance and repairs and paid for utilities, water, and taxes. Eugene McCauley identified himself as the owner of the Ballard Property on an application for homeowner's insurance. In addition, he signed a recorded easement that burdened the Ballard Property. Ms. Knorr also made Eugene McCauley a signatory on the REM account, and after becoming signatory, Eugene McCauley was the only person who wrote checks from the REM account. In short, Eugene McCauley had exclusive possession and control over REM's assets.

Under these circumstances, there is clear and convincing evidence that Elizabeth was merely a nominee who held her REM membership interest on Eugene McCauley's behalf. Eugene McCauley had a [sic] equitable interest in REM and exercised that interest. Elizabeth, on the other hand, had no involvement [in] and no knowledge of REM. She would be unjustly enriched to retain a 100% ownership interest in a company that was clearly under Eugene McCauley's exclusive control. As such, a constructive trust should be imposed to reflect Eugene McCauley's interest in REM and REM's assets, including the Ballard Property and the REM bank account.[40]

A constructive trust is an equitable remedy, a legal fiction, that adopts the analogy of a trust. The unjustly deprived person is labeled the "constructive beneficiary" and the person in wrongful possession is labeled the "constructive trustee."[41] The constructive trustee holds legal title to the trust property, subject to a duty to convey the property to the party that holds the equitable interest, i.e., the constructive beneficiary. In a constructive trust action, the successful plaintiff, the constructive beneficiary, wins an *in personam* order that requires the defendant, the constructive trustee, to transfer the property that is held in constructive trust to the constructive

---

[40] *Bird v. McCauley (In re McCauley)*, 538 B.R. 854, 861–62 (D. Utah 2015).

[41] *See Research-Planning, Inc. v. Segal (In re First Capital Mortg. Loan Corp.)*, 60 B.R. 915, 917–18 (Bankr. D. Utah 1986), *rev'd on other grounds*, 872 F.2d 335 (10th Cir. 1989), *rev'd on reh'g en banc*, 917 F.2d 424 (10th Cir. 1990).

beneficiary.[42]  In this case, the District Court concluded that "a constructive trust should be imposed to reflect Eugene McCauley's interest in REM and REM's assets, including the Ballard Property and the REM bank account" and therefore, the Trustee is entitled to an *in personam* order conveying title to the Ballard Property to the Trustee.

"Where property is held by one person upon a constructive trust for another, and the former transfers the property to a third person who is not a bona fide purchaser, the interest of the beneficiary is not cut off.  In such a case he can maintain a suit in equity to recover the property from the third person."[43]  The District Court, having concluded that Elizabeth held the sole REM membership interest for Eugene, held that a constructive trust should be imposed not only to reflect Eugene's interest in REM but in REM's assets, including the Ballard Property.  Based on the District Court's ruling, the Trustee is entitled to an *in personam* order conveying REM and its assets, including the Ballard Property, to the Trustee.

**F.  The Trustee Has Failed to Establish His Alter Ego Claim.**

The Court initially notes that the Trustee's variant of the alter ego doctrine may not be recognized under Utah law.  The alter ego doctrine permits courts to disregard the integrity of the corporation, view a controlling shareholder as indistinguishable from the corporation, and allow creditors of the corporation to reach assets of a controlling shareholder.[44]  This type of claim is

---

[42] *See id.*; *Am. Web, Inc. v. Flom Corp.*, No. 11-cv-02444-WYD-KMT, 2013 WL 1222059, at *6 (D. Colo. Mar. 25, 2013).

[43] Restatement (First) of Restitution § 160 cmt. g (Am. Law Inst. 1937); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 55 cmt. m (Am. Law Inst. 2011).

[44] *Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc.*, 789 P.2d 24, 26 (Utah 1990).

often referred to as "piercing the corporate veil." The doctrine is intended to "prevent the legal separation between the corporation and the controlling shareholder or shareholders from being used to perpetuate an injustice on third parties."[45]

The doctrine of alter ego has also evolved in some states "to permit creditors of an individual shareholder to reach the assets of the corporation when the requirements of the doctrine are satisfied."[46] This type of alter ego claim is sometimes referred to as "reverse piercing," and although the Utah Supreme Court has not definitively adopted this doctrine, it appears that Utah law allows such a claim.[47] There is also a variant of the "reverse piercing" theory where a corporate insider attempts to pierce the corporate veil from within so that the corporate entity and an individual will be considered one and the same, thereby permitting the individual's assets to be reached for the benefit of the corporation.[48]

The Trustee's alter ego claim is a variant for which this Court finds no support. The Trustee does not assert his alter ego claim as a creditor of REM seeking to reach the Debtor's assets. The Trustee does not assert his alter ego claim as a creditor of the Debtor seeking to reach REM's assets.[49] The Trustee is not even asserting his alter ego claim as an insider of REM seeking to reach the Debtor's assets for the benefit of REM. The Trustee is simply asserting his

---

[45] *Id.*

[46] *Id.*

[47] *See Colman v. Colman*, 743 P.2d 782 (Utah Ct. App. 1987). *But see Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1576 (10th Cir. 1990) ("[I]t is far from clear that Utah has adopted the doctrine of 'reverse' piercing.").

[48] *See Cascade Energy & Metals Corp.*, 896 F.2d at 1575–77.

[49] The Trustee asserted no claim under 11 U.S.C. § 544.

alter ego claim by standing in the shoes of the Debtor, who is not a creditor of REM.  The

Trustee's claim, standing in Eugene's shoes, is that Eugene was the controlling member of REM,

and REM's separateness should nevertheless be ignored for Eugene's benefit.

But even assuming the Trustee's alter ego theory is recognized under Utah law, to invoke

the alter ego doctrine:

> [T]here must be a concurrence of two circumstances: (1) there must be such a unity
> of interest and ownership that the separate personalities of the corporation and the
> individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a
> few individuals; and (2) the observance of the corporate form would sanction a fraud,
> promote injustice, or an inequitable result would follow.[50]

There is little or no evidence that Eugene used REM as his alter ego.  Although the Debtor was

permitted by Susan, the manager of REM, to live on the Ballard Property and was given

unfettered access to the REM Account, there is little or no evidence that Eugene conducted his

and REM's business on an interchangeable or joint basis as if they were one.[51]  Simply occupying

a premises and paying costs associated with occupancy and maintenance of a premises does not

create a unity of ownership and interest.  The evidence does not support a finding that there is

such a unity of interest and ownership that REM is in fact Eugene's alter ego.

The second prong of the alter ego test is "addressed to the conscience of the court, and the

circumstances under which it will be met will vary with each case."[52]  However, the second

prong of the test is not met simply because observing the integrity of the corporation "would in

---

[50] *Transamerica Cash Reserve*, 789 P.2d at 26.

[51] *See Colman*, 743 P.2d at 786 ("The rationale used by courts in permitting the corporate veil to
be pierced is that if a principal shareholder or owner conducts his private and corporate business
on an interchangeable or joint basis as if they were one, he is without standing to complain when
an injured party does the same.").

[52] *Messick v. PHD Trucking Serv., Inc.*, 678 P.2d 791, 794 (Utah 1984).

27

some way prevent a creditor of a controlling shareholder from quickly being made whole" or

"because the existence of the corporate form is inconvenient for a creditor seeking to pursue the

shareholder's assets."[53]  In order to establish that the observance of the corporate form would

sanction a fraud, promote injustice, or cause an inequitable result, the claimant must show that its

injury is connected to the entity's failure to observe its separateness.[54]  The Trustee failed to

identify any injury suffered by Eugene or any inequitable result that would give rise to an alter

ego claim.

Clearly, the Trustee asserts that Eugene has used REM to shield his assets from creditors,

but there is no evidence that REM ever incurred any debt or had any creditors, other than

possibly real property tax creditors.  Eugene's only creditor that was mentioned during the trial in

this case was Yukon Excavation.  Yukon's debt was unrelated to any of REM's activities.  Even

assuming that funds in the REM Account were Eugene's, that fact alone is not sufficient to

establish the elements required for alter ego.  One party's agreement to hold another party's

property to hinder, delay or defraud creditors may give rise to a legal cause of action, but it does

not necessarily establish that the parties are alter egos.

As a final observation, the Court notes that the Trustee cannot prevail on his alter ego

claim because he failed to establish that Eugene was a controlling member or manager of REM.

The alter ego doctrine, as defined by the Utah Supreme Court, permits courts to disregard the

integrity of the corporation, view a controlling shareholder as indistinguishable from the

corporation, and permit creditors of the corporation to reach assets of a controlling shareholder.

---

[53] *Transamerica Cash Reserve*, 789 P.2d at 26.

[54] *Cascade Energy & Metals Corp.*, 896 F.2d at 1578.

28

It is clear from this definition that the issue to be resolved in an alter ego action is whether a controlling shareholder's assets should be answerable for corporate debts. What's implied is that the question of whether an individual is a controlling shareholder logically must be determined prior to application of the alter ego doctrine. Specifically, in order for the alter ego doctrine to apply, the evidence must show that the individual who is alleged to be the corporation's alter ego was a controlling shareholder.

While a court may hear some of the same or similar evidence when asked to make a determination that an individual is a controlling shareholder as opposed to whether the alter ego doctrine should be invoked against a controlling shareholder, the alter ego doctrine is not the basis for determining whether an individual is in fact a controlling shareholder. Here, the Trustee has attempted to use the alter ego doctrine to show that Eugene was a controlling member or manager of REM. The essence of the Trustee's argument is that Eugene took certain actions on behalf of REM, making REM his alter ego. Therefore, because REM was his alter ego, Eugene must be a controlling member or manager of REM. The Trustee has put the cart before the horse, and the evidence he has presented does not support his assertion that Eugene was a controlling member or manager of REM.

**G.  The Trustee's § 549 Claim and Constructive Trust Claims Are Mutually Exclusive.**

As part of the District Court's Remand Order, this Court was directed to determine whether the post-petition transfer of the Ballard Property was an avoidable transfer. The fact that the District Court determined that the Ballard Property was held in constructive trust precludes recovery of the Ballard Property under § 549.

29

As previously stated, a constructive trust is an equitable remedy, a legal fiction, that adopts the analogy of a trust. The foregoing analysis and the imposition of a constructive trust preclude the Trustee's recovery under § 549. Under § 549, the Trustee may avoid a post-petition transfer of property of the estate. Property of the estate is defined in § 541(a)(1) as "all legal or equitable interests of the debtor in property as of the commencement of the case." Because constructive trusts are based on the analogy of a trust, the Debtor's interest in property held in constructive trust should be determined using that same analogy. Beneficiaries of trusts have an equitable interest in trust property but do not hold title to the trust property. The Debtor's interest in REM and its assets has always been an equitable interest. Because the Debtor has never held legal title to the Ballard Property, the Ballard Property cannot be recovered under § 549.[55]

## V.  CONCLUSION

The Trustee is entitled to the imposition of a constructive trust to reflect Eugene McCauley's interest in REM and REM's assets, including the Ballard Property, and to an *in personam* order conveying the Ballard Property to him. The Trustee's claims for resulting trust and alter ego will be dismissed. The Trustee's claims under § 549 and for violation of the § 362 automatic stay will also be dismissed.

_____END OF DOCUMENT_____

---

[55] Clearly, as already explained, the Trustee may recover the Ballard Property by the imposition of a constructive trust.

**_____ooo0ooo_____**
## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF LAW ON REMAND** shall be served to the parties and in the manner designated below:

**By Electronic Service:** I certify that the parties of record in this case, as identified below, are registered CM/ECF users and will be served notice of entry of the foregoing through the CM/ECF system:

Adam S. Affleck          asa@pyglaw.com, debbie@princeyeates.com;docket@princeyeates.com
Randy B. Birch           randy@BirchLawOffices.com, Katie@BirchLawOffices.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

•        *None*